UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE PROCTER & GAMBLE COMPANY, : | | Case No. 1:13-cv-337 |
| : | | |
| Plaintiff, : | | Judge Timothy S. Black |
| : | | |
| vs. : | | |
| : | | |
| CAO GROUP, INC., : | | |
| : | | |
| Defendant. : | | |

**ORDER DENYING PLAINTIFF'S MOTION TO DISMISS
DEFENDANT'S FOURTH AFFIRMATIVE DEFENSE
AND THIRD THROUGH SIXTH COUNTERCLAIMS (Doc. 18)**

This civil action is before the Court on Plaintiff's motion to dismiss Defendant's

fourth affirmative defense and third through sixth counterclaims pursuant to Fed. R. Civ.

P. 12(b)(6) for failure to state a claim (Doc. 18), and the parties' responsive memoranda

(Docs. 29, 30, 32, 34).[1]

## I.  BACKGROUND FACTS

Plaintiff brought this lawsuit to stop Defendants from allegedly infringing its

patents[2] by making, selling, offering to sell, and/or imparting various dental strip

products.  Defendant produces dental strip products that whiten teeth (Sheer White!®

Whitening Films), deliver fluoride (Sheer FluorX® Flouride Treatment Films), and

desensitize teeth (Sheer DesenZ® Desensitizing Films).  (Doc. 1 at ¶¶ 10, 12, 14).

---

[1]  In the alternative, Defendant requests leave of Court to amend its Answer and Counterclaims.
(Doc. 29 at 20).

[2]  The patents-in-suit are United States Patent 5,989,569 ("the '569 patent"); United States Patent
6,045,811 ("the '811 patent"); and United States Patents 7,122,199 ("the '199 patent").

In addition to asserting the patent defenses of non-infringement and invalidity (Doc. 14, AAD2 ¶¶ 35-36), Defendant alleges that the '569 and '811 patents are unenforceable due to alleged inequitable conduct (*id*. at ¶¶ 37-48), and alleged patent misuse (*id*. at ¶¶ 49-78). Defendant also brings counterclaims seeking a declaration that the '569 and '811 patents are unenforceable due to alleged inequitable conduct (Doc. 14 at ¶¶ 15-18 (Third Counterclaim)), and alleged patent misuse (*id*. at ¶¶ 19-22 (Fourth Counterclaim)). In addition, Defendant asserts that Plaintiff violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize one or more markets by enforcing certain patents allegedly procured by fraud on the United States Patent & Trademark Office ("USPTO") and/or engaging in "sham" litigation. (*Id*. at ¶¶ 23-74 (Fifth and Sixth Counterclaims)). Plaintiff maintains that Defendant's allegations fail to establish essential elements of these claims and defenses and/or they affirmatively establish that Defendant cannot prevail either on its defense of inequitable conduct or on its Third through Sixth Counterclaims.

## II.     STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

2

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id*. (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'"  *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)).  Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]"  *Id*.

Accordingly, in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678.  A claim is plausible where "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Id*. (citing Fed. Rule Civ. Proc. 8(a)(2)).  Under such circumstances, a motion to dismiss is well-taken.

# III.   ANALYSIS

## A. Inequitable Conduct Counterclaim/Defense

Defendant alleges an affirmative defense and counterclaim based on inequitable conduct. Specifically, Defendant maintains that P&G's claims of infringement of the '569 and '811 patents are barred, because the patents were procured through inequitable conduct before the USPTO. Further, Defendant argues that these patents would not have issued but for the misrepresentations. (Doc. 14, AAD at ¶¶ 44-48). Defendant maintains that P&G filed this lawsuit knowing of the misrepresentations. (*Id*., CC at ¶¶ 28-32). [3]

"Inequitable conduct is an equitable defense to a patent infringement case that, if proved, bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson & Co*., 649 F.3d 1276, 1285 (Fed. Cir. 2011). The remedy for inequitable conduct is the "unenforceability of the entire patent." *Id*. at 1287. "The concept of inequitable conduct in a patent procurement derives from the equitable doctrine of unclean hands: that a person who obtains a patent by intentionally misleading the PTO cannot enforce the patent." *Gen. Electro Musical Corp. v. Samick Music Corp.*, 19 F.3d 1405, 1408 (Fed. Cir. 1994).

---

[3]  Specifically, Defendant pled that P&G knows that the file histories show that the claims of the '569 and '811 Patents require that the system, strip, or substance individually fits an entire upper or lower row of teeth. (Doc. 14, AAD at ¶ 62; CC at ¶¶ 48-52). However, P&G knew the independent claims were not amended to recite the same. (*Id*.) Defendant also pleads that P&G knows that claim 17 of the '991 Patent requires repetition for about seven days, but that the instructions of the accused SheerWhite!® product states not to use more than five days. (*Id*., AAD at ¶¶ 69-73; CC ¶¶ 58-61). Defendant further pleads that P&G filed this lawsuit knowing the file history, that Defendant does not infringe P&G's patents, and that the lawsuit is therefore a sham. (*Id*., AAD at ¶¶ 64, 65, 74).

4

"[T]o plead the 'circumstances' of inequitable conduct with the requisite 'particularity' under Rule 9(b), the pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328 (Fed. Cir. 2009).[4] Although the "knowledge" and "intent" requirements may be averred generally, the pleadings "must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of…the falsity of the material representation, and (2) misrepresented this information with a specific intent to deceive the PTO." *Id.* at 1328-29. "A pleading that simply avers the substantive elements of inequitable conduct, without setting forth the particularized factual bases for the allegation," is insufficient. *Id.* at 1326-27. It must identify "both 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims." *Id.* at 1329-30.

Materiality and intent are separate components and the alleging party must prove each separately. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1351 (Fed. Cir.

---

[4] Plaintiff maintains that *Therasesne* is the proper standard for proving inequitable conduct. *See, Therasesne v. Abbott Lab.*, 649 F.3d 1276, 1291-93 (Fed. Cir. 2011). However, this Court has held that the *Exergen* pleading standard applies to allegations of inequitable conduct. *See, e.g., P&G v. Team Techs., Inc.*, No. 1:12cv552, 2012 U.S. Dist. LEXIS 170345, at *6 (S.D. Ohio Nov. 30, 2012) (a post-*Therasense* case stating that "the *Exergen* pleading standard applies to allegations of inequitable conduct"). The heightened standard of *Therasesne* is a standard for proving inequitable conduct on the *merits* and is not the correct standard for sufficiency of inequitable conduct *pleadings*. *See, e.g., Planet Bingo, LLC v. VKGS, LLC*, No. 1:12cv219, 2012 U.S. Dist. LEXIS 162496, at *11 (W.D. Mich. Nov. 14, 2012) ("*Therasense* involved review of a district court decision regarding inequitable conduct on the merits, not a Rule 12(b)(6) analysis as here. At this pleading stage, all that is required is plausibility based on the facts alleged in the pleading.").

5

2002). "Information is material for the purposes of an inequitable conduct determination if a reasonable examiner would have considered such prior art important in deciding whether to allow the parent application." *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1314 (Fed. Cir. 2006). If the court finds materiality and intent, the court must then "balance the equities to determine whether the patentee has committed inequitable conduct that warrants holding the patent unenforceable." *Cargill v. Canbra Foods, Ltd.*, 476 F.3d 1365, 1363 (Fed. Cir. 2007).

Defendant states that during the prosecution of the '569 and '811 patents, P&G representatives met with the Examiner on August 25, 1998. (Doc. 14, AAD ¶ 39). After the interview, the Examiner noted on the interview summary that "the main claim should recite dimensions of strip." (*Id.* at ¶ 40). P&G made some amendments to the claims, but the Examiner was not satisfied. (*Id.* at ¶¶ 41-42). On January 8, 1999, the Examiner rejected the pending claims, stating, "[t]he claims do not recite and require that … the conformable strip be of a size that individually fits the entire upper or lower rows of teeth when placed against the teeth…." (*Id.* at ¶ 42). P&G again amended the claims, this time adding the phrase, "of a size that individually fits an upper or lower row of a wearer's teeth when placed against the teeth[.]" (*Id.* at ¶ 43). P&G stated in the accompanying remarks that "[t]he Applicants have amended the Claims as helpfully suggested by the Examiner in the first paragraph of page 2 of the January 8, 1999, office action." (*Id.*) The Examiner subsequently allowed the '569 and '811 patents to issue.

Defendant's allegations include the "who, what, when, where, and how's" in support of its inequitable conduct defense and counterclaim:

(1) "Who"[5]: Defendant alleged that Ms. Angela Stone, P&G's representative, knowingly made false statements with deceptive intent (Doc. 14, AAD at ¶¶ 42-48; CC at ¶¶ 15, 16);

(2) "What" and "Where"[6]: Defendant alleged that "Ms. Angela Stone, on behalf of P&G, falsely stated that: 'The Applicants have amended the Claims as helpfully suggested by the Examiner in the first paragraph of page 2 of the January 8, 1999, office action,'" and that such a statement was a knowing and material misstatement.  (*Id.*, AAD at ¶¶ 42-44; CC at ¶¶ 15, 16).  Additionally, Defendant alleged that the false statements were made in relation to each of the independent claims of the '569 and '811 Patents, which lack the word "entire" with the phrase "upper or lower row of a wearer's teeth."  (*Id.*);

(3) "When": Defendant alleged that the false statements were made in P&G's Amendments filed on June 14, 1999, and that the Examiner relied on the false statements upon allowing the claims (*Id.*, AAD at ¶¶ 42-45; CC at ¶¶ 15-16);

(4) "How"[7]: Defendant alleged facts that the Examiner requested the claims "recite and require" the suggested language, P&G's representative falsely stated that the amendment was made as suggested by the Examiner, and the Examiner relied on the false statement

---

[5]  A specific individual making the misrepresentation must be named.  *Exergen*, 575 F.3d at 1329.

[6]  Identifying to which claims and limitations the misrepresentation is relevant satisfies the "what" and "where" of the standard.  *Exergen*, 575 F.3d at 1329.

[7]  The pleadings must set forth "'how' an examiner would have used this information in assessing the patentability of the claims."  *Exergen*, 575 F.3d at 1330.

and allowed the claims to issue (*Id*.)  Finally, Defendant alleged that, upon information and belief, "the Examiner would not have allowed the '569 and '811 Patents to issue but for P&G's inequitable conduct, since prior art of record includes strips of a size that individually fit a portion of an upper or lower row of teeth."  (*Id*., AAD at ¶ 46; CC at ¶¶ 15-16).[8]

Plaintiff maintains that its statement was true and was not a misrepresentation, and that because the Examiner had all of the facts before him, Plaintiff's remark does not and cannot rise to the level of a misrepresentation of material fact.  *Young v. Lumenis, Inc.,* 492 F.3d 1336, 1349 (Fed. Cir. 2007) (When the Examiner has the facts before him, he is "free to reach his own conclusions and accept or reject [the applicant's] arguments.").  Inequitable conduct claims should be dismissed in situations where, "[t]he examiner was able to compare the requested amendments to the original text and drawings and reach an independent conclusion[.]"  *Schwendimann v. Arkwright Advanced Coating, Inc.*, No. 11-820, 2011 U.S. Dist. LEXIS 101453, at *6 (D. Minn. Sept. 8, 2011) (no inequitable conduct had occurred because "[t]he examiner was able to compare the requested amendments to the original text and drawings and reach an independent conclusion[.]").

---

[8] Plaintiff claims that Defendant misrepresents various legal conclusions as factual allegations. Specifically, "that Ms. Stone intended to deceive the Patent Office, that Ms. Stone succeeded in deceiving the Patent Office, and that the Patent Office would not have allowed the '569 Patent and the '811 Patent to issue but for the deceit."  (Doc. 32 at PageID 301).  Defendant claims that these assertions are bare legal conclusions unsupported by any facts whatsoever.  The Court disagrees.  At this stage in the litigation, the Court finds that Plaintiff's allegations are sufficient to meet the *Exergen* standard.

However, "if an applicant's legal or interpretive argument is based on distorted facts or is contrary to what a person of skill in the art would understand a reference to disclose, the interpretation exceeds the bounds of acceptable argument and may be subject to a claim for inequitable conduct." *Schwendimann*, 2011 U.S. Dist. LEXIS 101453 at 13. Even if the Examiner has the facts before him and can make his own judgment, patent applicants still may not mischaracterize those facts. *Origin Medsystems, Inc. v. Gen. Surgical Innovations, Inc.*, No. C-96-20424-JW, 1998 U.S. Dist. LEXIS 22402 (N.D. Cal. 1998) ("[T]he Federal Circuit has held that mischaracterization of a patent reference may amount to inequitable conduct when such a reference is characterized in a way to mislead the patent office.").[9]

Accordingly, the Court finds that construing all facts in favor of the nonmoving party, Defendant has alleged sufficient facts to maintain a claim/defense for inequitable conduct.

### B. Patent Misuse

Patent misuse is an affirmative defense that "arises from the equitable doctrine of unclean hands, and relates generally to the use of patent rights to obtain or to coerce an unfair commercial advantage." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372

---

[9] *See, e.g., Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1183 (Fed. Cir. 1995) ("by 'burying' Wagensil in a multitude of other references, Hirsh and Smith intentionally withheld it from the PTO because this manner of disclosure was tantamount to a failure to disclose"); *McGinley v. Franklin Sports, Inc.*, 92 F. Supp. 2d 1216, 1220 (D. Kan. 2000) ("[T]hat the prior art is independently considered by the PTO does not alleviate the applicant's duty of candor to the PTO, and, therefore, a deliberate misrepresentation of the prior art's teachings, if sufficiently material, may justify a finding of inequitable conduct.").

(Fed. Cir. 1998).  "Patent misuse relates primarily to a patentee's actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant."  *Id.*  In order to prove patent misuse, the alleged infringer must show that "the patentee has impermissibly broadened the 'physical' or 'temporal scope' of the patent grant with anticompetitive effects."  *Windsurfing Intern. Inc. v. AMF, Inc.*, 782 F.2d 995, 1001 (Fed. Cir. 1986).  If the alleged infringer is successful in showing patent misuse, the patent is rendered unenforceable.  *B. Braun Med., Inc. v. Abbott Lab.*, 124 F.3d 1419, 1427 (Fed. Cir. 1997).  The patent remains valid however, and enforceability is restored if the misuse is purged.  *Id.*

Plaintiff maintains that Defendant's Fourth Counterclaim for patent misuse fails because patent misuse is an affirmative defense and not an independent cause of action. *B. Braun*, 124 F.3d at 1428 (explaining that "patent misuse simply renders the patent unenforceable…[T]he defense of patent misuse may not be converted to an affirmative claim for damages simply by restyling it as a declaratory judgment counterclaim.").[10]

However, Defendant seeks a declaration that the patents are unenforceable due to patent misuse; Defendant does not seek damages based on patent misuse.  (Doc. 14, CC at ¶ 22; Prayer for Relief at ¶ H).  The Federal Circuit has allowed such claims without comment.  *See, e.g., Inamed v. Kuzmak*, 249 F.3d 1356, 1362 (Fed. Cir. 2001) (reversing

---

[10] *See also CMI, Inc. v. Intoximeters, Inc*., 918 F. Supp. 1068, 1090 (W.D. Ky. 1995) (holding that patent misuse is not an affirmative cause of action, it is an affirmative defense).

district court's dismissal of plaintiff's "[patent] misuse cause of action" in a declaratory judgment action).[11] Thus, this Court declines to hold that such a claim is *per se* barred.

Plaintiff further argues that if Defendant is not seeking damages from the counterclaim, then its Fourth Counterclaim is the same as its Fifth Affirmative Defense for patent misuse and should be stricken as redundant. Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."). *See, e.g., Parkervision, Inc. v. Qualcomm Inc*., No. 3:11cv719, 2013 U.S. Dist. LEXIS 8467, at *18 (M.D. Fla. Jan, 22, 2013) (finding that the affirmative defenses were simply recitations of an alleged counterclaim and finding that "[i]n order to avoid the uncertainty that would be produced by counterclaims and affirmative defenses based on the same allegations simultaneously going forward" the same should be stricken as redundant pursuant to Fed. R. Civ. P. 12(f)(1)).[12]

Where the counterclaim is identical to the affirmative defense, a district court is within its sound discretion to dismiss the counterclaim. *Stickrath v. Globalstar, Inc.*, No. C07-1941, 2008 U.S. Dist. LEXIS 95127, at *5-7 (N.D. Cal. May 13, 2008). However, courts generally caution against dismissal of counterclaims as redundant simply because

---

[11] *See also Competitive Techs., Inc. v. Fujitsu Ltd*., 374 F.3d 1098, 1101 (Fed. Cir. 2004) ("The district court dismissed Counterclaim 5 (for declaratory judgment of unenforceability of the '349 and '400 patents) for failure to state a claim upon which relief could be granted, but only 'to the extent that Fujitsu seeks a broader remedy' than a declaration of unenforceability of the patent based on the University's alleged patent misuse.").

[12] *See also Gagan v. United Consumers Club, Inc*., No. 2:10cv26, 2011 U.S. Dist. LEXIS 153866, at *15-16 (N.D. Ind. Dec. 15, 2011) (holding same).

they concern the same subject matter or arise from the same transaction as the complaint. (*Id.*)  The proper inquiry is whether the counterclaims "serve any useful purpose"  *Pettrey v. Enter. Title Agency, Inc.*, No. 1:05cv1504, 2006 U.S. Dist. LEXIS 83957, at *3 (N.D. Ohio Nov. 17, 2006), and thus courts should dismiss or strike a redundant counterclaim only when "it is clear that there is a complete identity of factual and legal issues between the complaint and the counterclaim."  *Id.*[13]

While the Court finds that the claims do appear redundant, a counterclaim in a patent infringement case "serves a useful purpose" because, "[w]ithout the counterclaim the plaintiff might withdraw the suit and leave the rights of the parties in uncertainty.  If the defendant by filing a counterclaim for declaratory judgment, can prevent such voluntary withdrawal and keep the plaintiff in court until the respective rights of the parties are determined once and for all, the result was thought to be a wholesome one."  *Dominion Elec. Mfg. Co. v. Edwin L. Wiegand Co.*, 126 F.2d 172, 174 (6th Cir. 1942). Furthermore, Defendant "represents not only [it]self, but, in a sense, also the public which is likewise excluded from the field of monopoly" that an in-force patent grants to the holder.  *Id.* at 174-75.  Thus, Defendant's patent misuse counterclaim enables it to pursue the remedy of a declaratory judgment that the patents-in-suit are unenforceable on behalf of itself and the public, regardless of whether the underlying patent infringement

---

[13]  For example, the counterclaim may seek different relief, in addition to raising legal issues that the court may not reach in resolving the complaint and affirmative defenses.  *Iron Mountain Sec. Storage Corp. v. Am. Specialty Foods, Inc.*, 457 F. Supp. 1158 (E.D. Pa. 1978).

suit is unilaterally dropped by P&G. *Accord* Fed. R. Civ. P. 41(a)(2) (stating that the existence of a counterclaim limits a plaintiff's ability to voluntarily dismiss its claims).

Accordingly, both the Affirmative Defense and the Counterclaim for patent misuse survive.

### C. Fifth and Sixth Counterclaims

In its Fifth Counterclaim, Defendant alleges that P&G violated Section 2 of the Sherman Act, 15 U.S.C. § 2 ("Section 2"), by monopolizing or attempting to monopolize "a market for strips for dental treatment generally" in the United States (the "Dental Strips Market") and/or "a market for strips for dental treatment available through channels other than dental professional networks" in the United States (the "Limited Channel Dental Strips Market") by threatening to enforce and actually enforcing patents (the '569 and '811 Patents) allegedly procured by fraud on the PTO. (Doc. 14 at ¶¶ 23-43). In its Sixth Counterclaim, Defendant alleges that P&G violated Section 2 by monopolizing or attempting to monopolize the Dental Strips Market and/or the Limited Channel Dental Strips Market by instituting "sham" litigation against Defendant. (*Id.* at ¶¶ 44-74). Plaintiff maintains that Defendant has failed to allege essential elements of these claims.

When the allegation under Section 2 of the Sherman Act is that a party has attempted to monopolize, a plaintiff must prove: (1) that the defendant has engaged in

predatory or anti-competitive conduct; (2) with a specific intent to monopolize;[14] and

(3) a dangerous probability of achieving monopoly power. *Spectrum Sports v.

McQuillan*, 506 U.S. 447, 456 (1993).

### 1. Relevant market

The plaintiff must first define the relevant market and then plead facts from which

the Court can infer that the defendant has a dangerous probability of achieving monopoly

power. *Conwood Co., L.P. v. United States Tobacco Co.*, 290 F.3d 768, 782 (6th Cir.

2002).[15] The relevant market consists of two components: product or service market and

geographic market. *Brown Shoe Co. Inv. v. United States*, 370 U.S. 294, 324 (1962). To

ascertain the former, the "reasonable interchangeability" standard is applied. *White*, 723

F.2d at 500.[16] "Reasonable interchangeability" is assessed by considering: (1) product

uses (whether substitute products can perform the same function) and/or (2) consumer

response (also known as "cross-elasticity"), defined as "consumer sensitivity to price

---

[14] Specific intent to monopolize may be inferred from anti-competitive conduct, but not from legitimate business practices aimed at succeeding in competition. *White & White v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 506 (6th Cir. 1983).

[15] A geographic market is defined as an "area of effective competition," which is the zone in which buyers have the opportunity to purchase reasonably interchangeable or identical products from different suppliers. *Re/Max Intern., Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999).

[16] *See, e.g., Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n,* 388 F.3d 955, 961 (6th Cir. 2004) (the "reasonable interchangeability" standard is the essential test for determining the relevant product market); *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc*., 185 F.3d 606, 622 (6th Cir. 1999) ("The relevant market includes those products or services that are reasonably interchangeable with, as well as identical to, defendant's product.").

14

levels at which they elect substitutes for the defendant's product or service." *Ky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 917 (6th Cir. 2009). Although the relevant market definition is a highly fact-based inquiry, an "insufficiently pled or totally unsupportable proposed market" will necessitate a dismissal. *Michigan Division-Monument Builders of N. Am. v. Michigan Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008) ("Monument Builders") (affirming dismissal because geographic market definition was deficient "as a matter of law").[17]

Defendant proposed two plausible market definitions: strips for dental treatment generally and strips for dental treatment available through channels other than dental professional networks. (Doc. 14, AAD at ¶ 51). Defendant has also alleged that the geographic market is the United States. (*Id.* at ¶ 54).

### a. Product Market

Plaintiff argues that Defendant's alleged product market is both over-inclusive and under-inclusive. Specifically, it is over-inclusive because it includes a host of dental treatment products – *e.g.*, tooth whiteners, desensitizers, fluoride treatments, breath fresheners, benzocaine strips – that are not functionally interchangeable. (Doc. 14, CC at ¶¶ 39, 70 (asserting that P&G's tooth whitening strips do not compete with its fluoride or desensitizing products)). Defendant maintains, however, that the product markets are not over-inclusive because P&G's own patent claims cover, for example, a "delivery system

---

[17] The Court in *Monument Builders* found that the geographic market of a single cemetery was deficient as a matter of law because it did not "include[] the geographic area in which consumers can practically seek alternative sources of the product." *Id.* at 733.

for an oral care substance," that is not limited to whiteners. ('811 Patent, claim 1). While the fluoride or desensitizing products are not interchangeable with products for whitening teeth, P&G does have the ability to take significant amounts of business in such fluoride or desensitizing products away from Defendant and others in the market.[18] Therefore, Defendant has alleged sufficient facts to maintain that its product markets are not over-inclusive.

Plaintiff also alleges that Defendant's product market is under-inclusive because it is limited to strips and Defendant failed to plead facts to suggest why strips are not interchangeable with whiteners applied via, for example, a brush or tray. Defendant admits that "other [non-strip] forms of teeth whitening systems are available," but claims "many consumers regard such other options as inferior to strips" because of the additional inconvenience and expense. (Doc. 14, AAD at ¶ 55). Therefore, Defendant maintains that "whiteners applied via, for example, brush, 'pen,' or trays," do not have the ability – actual or potential – to take significant amounts of business away from producers of strips.

### b. Geographic Market

Next, Plaintiff maintains that Defendant failed to allege a properly defined geographic market. Defendant pled that "Crest Whitestrips® are generally available through channels other than dental professional networks, such as in retail stores and over

---

[18] "A proper product market includes 'those groups of producers which, because of the similarity of the products, have the ability – actual or potential – to take significant amounts of business away from each other.'" *U.S. Anchor Mfg. v. Rule Indus.*, 7 F.3d 986, 995 (11th Cir. 1993).

the internet" (Doc. 14, AAD at ¶ 52) and that "P&G has market power in the United

States" in each of the alleged product markets (*Id.*, CC at ¶¶ 24, 66; AAD at ¶ 54

(discussing revenue market shares in the United States)).  Plaintiff argues that Defendant

fails to explain how or even if a buyer of whitener products in Cincinnati, Ohio "can

practically turn" to California or Hawaii or any other U.S. state for those products.

P&G has cited no cases where an antitrust clam was dismissed based on a

proposed geographic market covering too large an area (*e.g.*, the entire United States).

Case law supports the definition of a nationwide market even if consumers could not

reasonably be expected to cross state lines for alternatives.  *See, e.g., Borden v. Fed.

Trade Comm.*, 674 F.2d 498, 503, n.4 (6th Cir. 1982) (proper geographic market for

processed lemon juice was the United States as a whole).  Because of the availability of

P&G's products on the internet (Doc. 14, AAD at ¶ 52), consumers could reasonably be

expected to purchase products and seek alternative products in the market across state

lines.

Moreover, "[m]arket definition is a highly fact-based analysis that generally

requires discovery."  *See Found. For Interior Design Educ. Research v. Savannah Coll.

of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001).  The ultimate determination of the

market definition need not be finalized at the pleading stage.  At this stage in the

litigation, Defendant has identified a credible definition of the relevant market.

### 2. *Monopoly power*

Next, Plaintiff claims Defendant failed to allege monopoly power or a dangerous probability of achieving such power.

Monopoly power is the ability "to raise prices or to exclude competition when it is desired to do so." *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 935 (6th Cir. 2005). As the existence of this power "ordinarily is inferred from the seller's possession of a predominant share of the market" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992), the principal factor in determining market power is market share. At the motion to dismiss stage, with discovery still to be completed, the plaintiff does not have to allege an exact, percentage-based market share. *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001) ("At this stage, it is sufficient that plaintiff has alleged specific facts that support a narrow product market in a way that is plausible and bears a rational relation to the methodology courts prescribe to define a market for antitrust purposes."). Thus, it is necessary to consider other structural factors to determine if a seller has a dangerous probability of achieving monopoly power. These include: "the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct and the elasticity of consumer demand." *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 792 (2d Cir. 1987).

Plaintiff maintains that Defendant offers no allegation that consumers could not, or would not, turn to other whitener products were P&G to demand anticompetitive prices for Crest White Strips®.  (Doc. 14, CC at ¶¶ 25, 44).

Defendant pled that:

> P&G and its licensees receive at least about 75% of the annual revenue in the United States for strips for dental treatment generally, and perhaps at least about 90% of the annual revenue in the United States for strips for dental treatment generally.  Alternatively or additionally, upon information and belief, P&G and its licensees receive at least about 75% of the annual revenue in the United States for strips for dental treatment available through channels other than dental professional networks, and at least about 90% of the annual revenue in the United States for strips for dental treatment available through channels other than dental professional networks.

(Doc. 14, AAD at ¶ 54).[19]  Such market shares, if proven, support a finding that P&G has monopoly power or a dangerous probability of achieving monopoly power in the relevant markets.  *Richter Concrete Corp. v. Hilltop Concrete Corp*., 691 F.2d 818, 826 (6th Cir. 1982).

Ultimately, in order to determine whether P&G has monopoly power or a dangerous probability of achieving monopoly power, the Court will likely require additional facts and expert testimony such as: consumer behavior, advertising, licensing,

---

[19]  Revenues are commonly used by courts to determine market share.  *See, e.g., Byers v. Bluff City News Co*., 609 F.2d 843, 851, n. 21 (6th Cir. 1979) (stating that the court's examination "of confidential dollar sales volume figures submitted under seal shows that between 1973 and 1975, *Bluff City* had from 94% [t]o 96% of the relevant market measured in sales volume.").

etc, through discovery.[20]  However, at this stage in the litigation, Defendant has properly

alleged monopoly power or a probability of achieving such power.

### 3.  *Predatory or Exclusionary Conduct*

### a.  Fifth Counterclaim

Plaintiff maintains that the Fifth Counterclaim, which alleges a violation of

Section 2 based on the enforcement of two patents (the '569 and '811 patents) allegedly

procured by fraud on the PTO ("*Walker Process* fraud")[21], must be dismissed for the

additional reason that Defendant has failed to plead facts establishing fraud.  "To

demonstrate *Walker Process* fraud, a claimant must make a higher threshold showing of

both materiality and intent than are required to show inequitable conduct."  *Dippin' Dots,*

*Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007).[22]  *Walker Process* fraud requires

proof that traditional common law fraud was committed on the PTO.  *Abbott Lab. v.*

*Andrx Pharm., Inc.*, 241 F.R.D. 480, 487 (N.D. Ill. 2007).

---

[20]  Plaintiff maintains that revenue data will not accurately reflect market share because the price
difference among products in the market is significant.  "Although revenues are often relied upon
as a surrogate for quantity, actual unit sales must be used whenever a precise spread between
various products would make the revenue figure an inaccurate estimator of unit sales."  *U.S.
Anchor Mfg. v. Rule Indus.*, 7 F.3d 986, 999 (11th Cir. 1993).  At this point in the litigation,
however, the Court cannot reach this conclusion.

[21]  *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174 (1965)
("enforcement of a patent procured by fraud on the Patent Office may be violative of [section] 2
of the Sherman Act provided the other elements necessary to a [section] 2 case are present").

[22]  "A finding of fraud requires higher threshold showings of both intent and materiality than does
a finding of inequitable conduct…[I]t must be based on independent and clear evidence of
deceptive intent together with a clear showing of reliance [by the PTO]."  *Rowe Int'l Corp. v.
Ecast Inc*., 241 F.R.D. 296, 303 (N.D. Ill. 2007).

Defendant pled that P&G made misrepresentations of material fact to the PTO during prosecution of the '569 and '811 patents sufficient to rise to the level of inequitable conduct, and that these patents would not have issued but for the misrepresentations.  (Doc. 14, AAD at ¶¶ 44-48).  Defendant also pled that P&G filed this lawsuit with knowledge of the misrepresentations.  (*Id*., CC at ¶¶ 28-32).  Accordingly, the Court finds that Defendant has pled sufficient facts to allege *Walker Process* fraud.

### b.  Sixth Counterclaim

Plaintiff maintains that the Sixth Counterclaim should also be dismissed because Defendant's allegations fail to establish objective baselessness.  Defendant's Sixth Counterclaim alleges a violation of Section 2 based on the enforcement of the '199, '569, and '811 patents through "sham" litigation.  To state such a claim, Defendant must allege (in addition to all the other elements of a Section 2 claim) facts plausibly showing that P&G's suit was (1) "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits [of the claims asserted,]"  *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus*., 508 U.S. 49, 60 (1993) ("PRE"); and (2) subjectively motivated by a desire "to interfere directly with the business relationships of a competitor…through the use [of] the governmental process – as opposed to the outcome of that process – as an anticompetitive weapon[.]"  *Id.* at 60-61.

Based on the same facts alleged to sustain a *Walker Process* claim, the Court finds that Plaintiff's allegations are also sufficient to make out a sham litigation claim.[23]

## IV.   CONCLUSION

Accordingly, for the reasons stated here, Plaintiff's motion to dismiss Defendant CAO Group's fourth affirmative defense and third through sixth counterclaims (Doc. 18) is **DENIED**.

**IT IS SO ORDERED**.

Date:  <u>September 24, 2013</u>                    /s/ Timothy S. Black
                                                  Timothy S. Black
                                                  United States District Judge

---

[23]  Specifically, Defendant pled that P&G knows that the file histories show that the claims of the '569 and '811 Patents require that the system, strip, or substance individually fits an entire upper or lower row of teeth (Doc. 14, AAD at ¶¶ 62; CC at ¶¶ 48-52); P&G knows that claim 17 of the '991 Patent requires repetition for about 7 days.  (*Id*., AAD at ¶¶ 69-73; CC at ¶¶ 58-61); P&G filed this lawsuit knowing the file history, that Defendant does not infringe P&G's patents, and that the lawsuit is therefore a sham  (*Id*., ADD at ¶¶ 64, 65, 74); and that P&G instituted this suit in bad faith with an attempt to monopolize (*Id*., ADD at ¶¶ 57-59).